# UNITED STATES DISTRICT COURT

for the
District of MAINE
Portland, Maine

U.S. DISTRICT COURT
DISTRICT OF MAINE
RECEIVED & FILED

2024 NOV -5 P 3: 25

DEPUTY CLERK

| | |
|---|---|
| **KATHLEEN O'CONNELL,**<br>**Plaintiff**<br><br>- v -<br><br>**LIAM HUGHES**, in his former official capacity as Director of the Maine Animal Welfare Program and in his individual capacity; **RACHAEL FISKE**, in her official capacity as Maine Assistant State Veterinarian and in her individual capacity; **ANGELA ROGERS**, in her official capacity as a Humane Agent for the Maine Animal Welfare Program and in her individual capacity; **WENDELL STROUT**, in his official capacity as the Animal Control Officer for Androscoggin County and in his individual capacity; **HEIDI JORDAN** of Jordan Farm Livestock Rescue in her individual capacity; **LILLIAN BAGLEY** of Bagley Bog Farm in her individual capacity; and **MAINE DEPARTMENT OF AGRICULTURE, CONSERVATION AND FORESTRY, ANIMAL WELFARE PROGRAM,**<br>**Defendants** | **COMPLAINT FOR CIVIL RIGHTS VIOLATION AND INJUCTIVE RELIEF AND DECLARATORY RELIEF SOUGHT;**<br><br>**DEMAND FOR JURY TRIAL**<br><br>1. 42 U.S.C. §1983 [numerous deprivations of constitutional rights under color of state law and state's rights as described in this complaint]<br>2. U.S. Constitution 4th Amendment [unreasonable search and seizure]<br>3. U.S. Constitution 5th and 14th Amendments [denial of due process]<br>4. Maine Constitution, Art. 1, §1 [denial of right to protect property], §6.A [denial of due process, denial of protection]<br>5. Maine Statutes, Title 17-A M.R.S. §353, §354, §355<br>6. Maine Statutes, Title 17 M.R.S. §1021 (6), 1021(5-B) |

# COMPLAINT FOR A CIVIL CASE

## I.    The Parties to This Complaint

### 1.  The Plaintiff

1.  Kathleen O'Connell ("O'Connell")

    222 Ridge Rd

    Wales, Maine 04280

    Androscoggin County

    207-754-6322

    kat@elmvalefarm.com

    O'Connell is a natural person. Motivated by moral beliefs and consistent with local, state, and country mores and laws, O'Connell has cared for a large community of cats living on her family's farm for over 40 years. O'Connell is a state employee as of April 11, 2024 under the Maine Department of Labor.

### 2.  The Defendants

2.  Liam Hughes ("Hughes")

    Former Director, Maine Animal Welfare Program

    20 Blossom Lane

    Deering Building

    Augusta, Maine 04333

    Kennebec County

    207-287-3846

    liam.hughes@maine.gov

Hughes is a former employee of the State. At all times relevant hereto he acted in concert with the other Defendants and under color of state law. He is sued both in his former official and individual capacity.

3. Rachael Fiske ("Fiske")

   Assistant State Veterinarian

   Division of Animal Health & Animal Welfare Program

   20 Blossom Lane

   Deering Building

   Augusta, Maine 04333

   Kennebec County

   207-592-3608

   rachael.fiske@maine.gov

   Fiske is an employee of the State. At all times relevant hereto she acted in concert with the other Defendants and under color of state law. She is sued both in her official and individual capacity.

4. Angela Rogers ("Rogers")

   Humane Agent, Maine Animal Welfare Program

   20 Blossom Lane

   Deering Building

   Augusta, Maine 04333

   Kennebec County

   207-215-8671

   angela.rogers@maine.gov

Rogers is an employee of the State. At all times relevant hereto she acted in concert with the other Defendants and under color of state law. She is sued both in her official and individual capacity.

5. Wendell Strout ("Strout")

Animal Control Officer for Androscoggin County

220 Main Street

Greene, Maine  04236

Androscoggin County

207-212-2395

email: NA

Strout is an employee of the towns in Androscoggin County. At all times relevant hereto he acted in concert with the other Defendants and under color of state law. He is sued both in his official and individual capacity.

6. Heidi Jordan ("Jordan")

Owner, Jordan Farm Livestock Rescue

214 Fairbanks Road, Farmington, Maine 04938

Franklin County

207-778-6690

jordanfarmrescue@gmail.com

Jordan is an owner of Jordan Farm Livestock Rescue. The AWP gave Jordan care of O'Connell's cats and many of them resided at her facility. At all times relevant hereto she acted under color of state law by conspiring with one or more state officials. She

is sued both in her official capacity as a conspirator of state officials, and individual capacity.

7. Lillian Bagley ("Bagley")

Owner, Bagley Bog Farm

704 Bailey Hill Road, Farmington, Maine 04938

Franklin County

207-860-6208

207-491-5814

d_lbagley@yahoo.com

Bagley is an owner of Bagley Bog Farm. Bagley was given care of a number of O'Connell's cats. At all times relevant hereto she acted under color of state law by conspiring with one or more state officials. She is sued both in her official capacity as a conspirator of state officials and individual capacity.

8. Maine Department of Agriculture, Conservation and Forestry, Animal Welfare Program ("AWP" or "State")

28 State House Station

Augusta, Maine 04333

Kennebec County

207-287-3846

animal.welfare@maine.gov

AWP is the state government entity whose policies and procedures governed the actions of all Defendants. The AWP is the entity for which the other Defendants worked or to which they associated or conspired at all times relevant hereto.

## II.   Basis for Jurisdiction

9.  The Defendants violated O'Connell's civil rights under 42 U.S.C. § 1983, as well as related state laws. These rights include those in the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution; Article 1, Section 1, Section 5, and Section 6-A of the Maine State Constitution; and *Title 17-A M.R.S. § 353, § 354, § 355* of Maine State Statutes, and others.

10. This Court has jurisdiction over O'Connell's federal claim under 42 U.S.C. § 1983, 28 U.S.C. § 1331 and 1343. The Court has supplemental jurisdiction over O'Connell's claims which are based on state law under 28 U.S.C. § 1367.

11. Venue in the Androscoggin County Superior Court, Auburn, Maine is proper pursuant to 28 U.S.C. § 1391 because the substantial events giving rise to the claims in this action occurred in Androscoggin County.

12. Each and all of the acts (or threats of acts) alleged herein were done by Defendants, or their officers, agents, and employees, under color and pretences of the statutes, ordinances, regulations, customs and usages of the State of Maine.

13. **Statement of Claim**

14. On November 5, 2019, Rogers serves a search and seizure warrant at 222 Ridge Rd in Wales, Maine and a civil summons for cruelty to animals on O'Connell. This sets in motion years of abuse. Persons involved included the defendants named in this suit. The affidavit for a warrant written by Rogers would prove rife with errors,

misrepresentation of facts, and use of prejudicial language. Facts would later reveal

the State starting planning this seizure on October 21, 2019, before having a warrant

or any facts to support the action. No investigation was undertaken. All facts

collected were related to the actions of defendants. The methods and procedures used

during this seizure resulted in physical injury to cats and damage to the home and its

contents. The is animal abuse and willful destruction of personal property. The State

would later claim they did a thorough search and did not find evidence of medical

treatments. O'Connell would prove through photographic evidence that items for

medical treatment were in plain view and other supposed factual statements made by

defendants were likewise proven inaccurate. During the subsequent year- long battle

to save her cats, O'Connell would reveal numerous errors in the AWP's evidence.

This included misrepresentation of evidence, proffering wrongful or disproven

evidence, and multiple errors in descriptions and calculations upon which evidence

was based. The judge in this case dismissed the case without merit and ordered the

cats returned to O'Connell. O'Connell pleaded not guilty to the civil summons and no

further action was taken by the State on that matter.

15. Almost exactly a year from the day they were taken, the State returned most of the

cats. The State failed to return eighteen cats, made substitution with four cats that did

not belong to O'Connell, continued to make unreasonable demands and pursue

actions against her. Despite providing the AWP with photographs and clear evidence

of errors in the documenting of animals in the delivery, the AWP ignored O'Connell.

They then initiated a new argument that they were keeping nine of the cats based on a

single sentence in the court order they chose to interpret as an acceptable excuse.

16. The State served a summons on O'Connell on May 28, 2021. After a day in court, the State withdrew their complaint but continued to make unreasonable demands on her.

17. On January 28, 2022, O'Connell is recovering at home from COVID after spending eight days in the hospital. She is grieving her father and her best friend who both contracted the same infection and both died in hospital. She is dealing with burial, estate, and financial pressures and the loss of her job that terminated her while she was hospitalized. A family friend agreed to feed and water O'Connell's cats while she was hospitalized. O'Connell was unaware until she returned home to find many cats had died in her absence, that the person who agreed to care for her cats, through no negligence or malice on his part, proved unable to properly care for the animals. She is also grieving the loss of these cats. O'Connell's brother, who has a history of reporting O'Connell to state agencies, took advantage of O'Connell's absence to enter her home without permission and report the dead cats to the authorities. He took no action to help the cats or inform O'Connell of the situation. The AWP then took advantage of this tragic situation, not to sprint into action to save these reported cats in need, but to write up another warrant and take O'Connell's remaining cats while she was recovering at home and attached to oxygen. This is an example of a citizen using state agencies as weapons. During this seizure, Rogers recorded from behind a closed door and without permission, a conversation O'Connell had with an acquaintance who came to see if she was okay. Also, during this seizure, five cat carriers belonging to O'Connell and two cases of canned cat food turned up missing. Many cats were again injured as evidenced by bloody faces. This time the AWP primarily trapped the cats by using a warrant covering multiple days and leaving cages overnight. These trapped

cats were confined without food and water, crying and struggling to escape the trap, potentially from 4PM until 8AM or later (16+ hours). O'Connell was not allowed to provide them with relief from this cruelty. At this time, O'Connell is still attempting to get back eighteen cats the AWP has refused to return from the first court order; nine of those cats were being kept on the AWP's argument against the 2019 court order, and nine the AWP insisted they had already returned. The two cases were heard at the same time and the court agreed the AWP had no authority to keep the nine cats based on the AWP's argument with the court and ordered them returned. As for the other nine, the court decided O'Connell did not provide enough evidence to prove she did not have them. O'Connell believes she provided more than enough evidence to show the defendants could not possibly know for certain they had returned all the animals. Whereas, O'Connell had proven throughout that she knew her cats and could be certain of which were returned and which were not.

18. Despite rules of law, such as Title 17 §103-B and Res Judicata, the district attorney chose to prosecute this case, the courts found against O'Connell on this second seizure and gave permanent possession of her precious cats to the State. O'Connell appealed to the Superior and Supreme Courts in an attempt to save her cats, but failed. While O'Connell prevailed on the motion to return nine cats, the AWP again failed to return all the cats and the activity of returning those cats revealed negligence and deception by the defendants named in this case. Two of the cats returned were among the nine the court decided O'Connell did not prove had not already been returned. The appeals courts refused to consider this obvious evidence in making its decision. Furthermore, the defendants took no action to correct their error and return

the remaining cats and fought O'Connell's attempts to recover them. To O'Connell's knowledge, no investigation was done to find the missing cats. The State's response to O'Connell was that they were not at the shelter. This indicates collusion by the shelter to steal O'Connell's cats. Her report of missing and substituted cats was dismissed by the AWP. One cat the AWP insisted they had returned had already been euthanized months previously, but this was not reported by the AWP until after the second court order to return her. The AWP obviously could not have returned a dead cat, yet no mention of this was made during the court procedure involving this cat. This was one of several instances in which the defendants withheld evidence.

19. During these four years, the errors, misrepresentations, lies, and the condescending and patronizing attitudes of defendants, were not the actions or behaviors of a person of ordinary prudence and certainly not of a state employee. The defendants have a duty to act a certain way, to be honest and forthright in their dealings with the public, to carry out their duties with a high level of competence, a complete lack of prejudice, to admit to and correct their errors with expediency, and to present facts with stringent accuracy. This is how O'Connell conducts herself as a state employee and expects the same in others. The actions by defendants in this case were directly responsible for the abuse and deaths of over one hundred cats, and for O'Connell and her surviving cats to suffer monetary losses, physical and psychological stress, grief, damage to property, damage to reputation, and harassment and threats by the public. All of this was unnecessary. In addition, this state has spent over one million to carry out these actions, an outrageous amount and misuse of public funds.

20. The State's only negotiation was to allow O'Connell to possess two or three cats for the remainder of her life in return for dropping charges. The State has no right to dictate how a citizen lives within the law and there is no law against the number of animals O'Connell can own.

21. Following is a partial list of injuries suffered as a direct result of state actions; injuries that would not have occurred if the State had left these animals under O'Connell's care:

　　1.　A newborn kitten died under mysterious circumstances seven days into state custody. This describes a deception or lack of competency.

　　2.　A 15-year-old cat that knew no other caretaker except O'Connell and lived all her life on the farm, with age-related ailments that O'Connell had been treating successfully for several years, after seven months in state custody, was described in a medical record as emaciated, unkempt, hunched, very depressed, circling propulsively, and knocking into the walls of her cage. This describes a tortured animal.

　　3.　An apparently healthy young cat was found dead in his cage after seven months in state custody, having died from what appears to be an untreated urinary tract infection. This suggests neglect.

　　4.　A healthy older cat that was bottle raised by O'Connell, ordered returned to O'Connell in the 2019 court order and illegally held by the state for two more years, was found dead in his cage shortly before he was ordered returned by the second court. The defendant's refusal to return this cat in a timely manner is a direct cause of his loss.

5. One cat, Beebs, was given to a foster person who gave a fake address. Beebs was among those ordered returned by two different courts. She has never been found. The defendant's lack of competency is a direct cause of her loss.

6. After the second seizure, one cat, Grayson, contracted Feline Leukemia while in state custody. His symptoms became unmanageable in state hands and he had to be euthanized. O'Connell's cats were tested by the State for Feline Leukemia during the first seizure and all were negative. This sweet little cat was happy and healthy before he was taken by the AWP and the defendant's actions in taking this cat from his home with O'Connell is a direct cause of his loss.

7. One cat, Hopper, was returned with a flea infestation that infested O'Connell's current community of cats. O'Connell has experienced only one flea infestation on the farm in over 40 years. A flea infestation takes from 3 to 12 months to eliminate, requires time to clean and treat the house, time to treat cats each month, and costs approximately $400 per month for treatments until fleas are eradicated. This indicates a lack of competency and is a direct cause of extensive losses.

8. O'Connell, despite being a legally indigent person and providing the court with financial information that was incorrectly restated by the court (an overestimation of income and underestimation of expenses) in its decision, was ordered by the court to give the State over $6,000 or they would not consider her appeal to get back her property. This is equivalent to extortion or a demand for ransom. The loss of this money put O'Connell deeper into debt,

such that she cannot buy oil to heat her house or pay the real estate taxes on her property, situations that may lead to homelessness.

9. Thirteen days after being seized, Toxic, a cat with known seizures is suspected of rabies and killed by the AWP. The cat was one of 82 taken from inside a residence. O'Connell had informed Rogers the cats were kept inside for safety and protection There was no possible way this cat had rabies. Once again, the State ignored O'Connell and made up their own story. The cat had been in custody over 10 days. None of the other cats showed signs of rabies. Nobody ever called O'Connell to ask her about the cat or warn her about a rabies threat. The cat was tested and did not have rabies. Toxic had been seen by and treated twice by several veterinarians for her seizures while in O'Connell's care at a cost of over $400. The defendant's actions were a direct cause of the loss of this cat.

10. O'Connell's cats were infested with the Giardia organism while in AWP custody. This infestation has no legal treatment and results in bloody diarrhea. O'Connell's cats have never had internal parasites and were tested negative for Giardia and worms two months before they were seized by the AWP. The State's actions are a direct cause of this infestation in O'Connell's cats.

11. It is O'Connell's belief that her cats were exposed to numerous viral and parasitic organisms as a direct result of the defendant's actions. This has caused increased time and money for treatment, and sometimes loss of animals.

12. O'Connell's cats were taken from a protected, closed environment with everything they need to live free and happy lives. Their ailments were treatable and not life-threatening. The State exposed them to multiple foreign organisms, stressful unpleasant experiences, and strangers, and this exposure caused lingering negative affects in the lives of the surviving cats and O'Connell.

13. No statements made by the defendants describing O'Connell, her residence, or her cats in any of these cases are accurate.

14. Jordan and Bagley attempted to deceive O'Connell and get information about adopting cats by sending her an inquiry under a false name. Shortly after, O'Connell received a warning from Hughes about running an illegal shelter and she needed to comply with the rules and licensing for shelters. O'Connell does not run a shelter and never claimed to run a shelter. Nothing about O'Connell's situation describes a shelter. The fact that Hughes did not know this indicates a lack of knowledge or an abuse of his office. O'Connell believes that Jordan and Bagley encouraged him to harass her with this new demand.

15. Jordan refused to allow OConnell to enter her property to get her cats after a Judge ordered they be returned. This is equivalent to theft.

16. Jordan and/or people working in her shelter gave misleading information to a newspaper reporter and stated their disagreement with the Judge's decision in the 2019 case. The only reason for giving out this information was to cause O'Connell harm. Shortly after, O'Connell began to get harassing emails and

nasty online posts from strangers. Later, O'Connell's neighbors provide her with a copy of a harassment flyer they received in their mail. This flyer contains photos of her, her father, and their home. It lists their cell phone numbers and asks people to call her, her father, the town, and the animal control officer to complain about the cats. It is apparently sent to everyone in town. This is harassment and a misuse of the postal service.

17. Many of O'Connell's cats were spayed or neutered without her permission. This altering of property is equivalent to theft.

18. Not until much later in these cases when a new employee was brought in did O'Connell receive back her animals that died while in State custody. O'Connell properly buries all animals that die on her farm. Her cats are gently laid to rest in deep graves on their home ground. She was prevented from provided this care for her animals and believes her animals were likely disposed of in group cremations and their ashes tossed into mass graves or a dump somewhere.

19. Over the course of four years and three court appearances, there have been many incidents contributing to the wrongs outlined in this complaint. The state of Maine code of ethics for employees states they will conduct themselves with integrity, dignity, fairness and respect for others. They will respect privileged and confidential information and use that information appropriately, not for personal advantage. The defendants failed in their duty to act appropriately. In consideration of time and space, O'Connell has not included every inappropriate incident in this complaint and reserves the right

to include these additional facts in any future court proceedings related to this
complaint.

**III.   Statement of Claim: First Cause of Action: (42 U.S.C. § 1983, Violation of the 4th
Amendment to the United States Constitution and Article 1, Section 5 of the Maine State
Constitution: Unreasonable Search and Seizure)**

20. O'Connell incorporates by reference all preceding paragraphs as if fully
    restated here.

21. Defendants at all times relevant to this complaint were acting under color of
    state law and these actions deprived O'Connell of rights, privileges, or
    immunities guaranteed under the Fourth Amendment to the Constitution of the
    United States and Maine State Constitution, Article 1, Section 5.

22. Defendants at all times relevant to this action were acting pursuant to a policy
    or custom of the AWP.

23. The AWP's policy or custom, and its failure to adopt clear policies and failure
    to properly train its employees were a direct and proximate cause of the
    constitutional deprivation suffered by O'Connell.

24. Defendants AWP, Hughes, Fiske, and Rogers made an unreasonable search
    and seizure of the property where O'Connell resides. Rogers misleads,
    misstates, exaggerates, misrepresents, and misinterprets facts in her affidavit
    to fabricate probable cause and allow her to obtain a warrant. This warrant
    was obtained despite the fact that O'Connell complied with a demand from

Rogers to get her cats vaccinated against rabies and treated for medical conditions. Catching and trapping of cats ensued despite clear and present evidence of necessary sustenance, necessary medical attention, proper shelter, protection from the weather, and humanely clean conditions or legally acceptable excuse.

IV. **Statement of Claim: Second Cause of Action: (42 U.S.C. § 1983, Violation of 5th and 14th Amendments to the Constitution of the United States and Maine State Constitution, Article 1, Section 6-A: Denial of Due Process)**

25. O'Connell incorporates by reference all preceding paragraphs as if fully restated here.

26. Defendants at all times relevant to this complaint were acting under color of state law and these actions deprived O'Connell of rights, privileges, or immunities guaranteed under the Fifth and Fourteenth Amendments to the Constitution of the United States and Maine State Constitution, Article 1, Section 6-A.

27. Defendants at all times relevant to this action were acting pursuant to a policy or custom of the AWP.

28. The AWP's policy or custom, and its failure to adopt clear policies and properly train its employees were a direct and proximate cause of the constitutional deprivation suffered by O'Connell.

29. All Defendants acted with malice and deliberate disregard to deprive or conspire to deprive O'Connell of property without due process of law as

guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Maine State Constitution, Article 1, Section 6-A. Strategies were employed by defendants to bypass court orders and keep animals from O'Connell, thereby ignoring and denying due process. This continues to this day in that the State has continually blocked O'Connell from regaining the cats that were never returned and remain missing per the 2019 court order; evidence that these defendants allow their personal opinions to take precedence over the law.

**Statement of Claim: Third Cause of Action (42 U.S.C. § 1983, Maine State Constitution, Article 1, Section 1: Possessing and Protecting Property)**

30. O'Connell incorporates by reference all preceding paragraphs as if fully restated here.

31. Defendants at all times relevant to this complaint were acting under color of state law and these actions deprived O'Connell of rights, privileges, or immunities guaranteed under the Maine State Constitution, Article 1, Section 1.

32. Defendants at all times relevant to this action were acting pursuant to a policy or custom of the AWP.

33. The AWP's policy or custom, and its failure to adopt clear policies and properly train its employees were a direct and proximate cause of the constitutional deprivation suffered by O'Connell.

34. Actions by all Defendants prevented O'Connell from possessing and protecting property. These animals depended upon O'Connell to protect them and this right was taken away by the State. By this action, animals that were protected and cared for by O'Connell were caused to suffer and die in the possession of the State. O'Connell was blocked from regaining possession of animals ordered returned. The State attempted to negotiate terms with O'Connell whereby she would be denied the right to possess property in return for dropping charges.

## Statement of Claim: Fourth Cause of Action (42 U.S.C. § 1983, Maine State Constitution, Article 1, Section 6-A: Equal Protection)

35. O'Connell incorporates by reference all preceding paragraphs as if fully restated here.

36. Defendants at all times relevant to this complaint were acting under color of state law and these actions deprived O'Connell of rights, privileges, or immunities guaranteed under the United State Constitution and the Maine State Constitution.

37. Defendants at all times relevant to this action were acting pursuant to a policy or custom of the AWP.

38. The AWP's policy or custom, and its failure to adopt clear policies and properly train its employees were a direct and proximate cause of the constitutional deprivation suffered by O'Connell.

39. All Defendants deprived or conspired to deprive O'Connell of equal protection as guaranteed by the Maine State Constitution, Article 1, Section 6-A. O'Connell's reports of missing property were dismissed and ignored. O'Connell was typically treated with prejudice by Angela Rogers and others involved in prosecuting these cases as evidenced by the State's total lack of consideration over her missing animals. The defendant's repeatedly misrepresented evidence in order to eliminate O'Connell's animals, denying her equal protections under the law. Defendant's repeatedly treated O'Connell with condescension and prejudice as evidenced by their statements.

40. Hughes, Jordan and the AWP committed fraud by attempting to extort money from O'Connell for expenses allegedly incurred for the care of her cats. Jordan created the invoices, the State apparently paid Jordan for the invoices, and Hughes compiled them and sent them to O'Connell with a payment demand before any court decision was rendered. The expenses invoiced to O'Connell were not reasonable or in keeping with accepted accounting practices. Therefore, this was an act of negligence betraying malice or pressure of fraud.

41. The State's actions made the claimant a target of harassment, prejudice, and bias. The State made comments to the press that were incorrect and influenced public opinion. After judgment in favor of O'Connell, the State had an opportunity to prevent or minimize backlash to O'Connell by offering a public apology. Instead, the State remained quiet while the state-approved shelter owned by Jordan released misinformation to the press. Animal welfare is an emotional issue and the State's inappropriate decisions in this case

unnecessarily exposed O'Connell and her animals to the abuses of the public. Animals are still missing, presumably given to or taken by some misguided member of the public. Therefore, the State failed in its duty to protect O'Connell and the animals involved.

42. Defendants chose to interpret the animal welfare laws to suit their own personal views. There were no controls inhibiting their actions. Prejudice was clear in their actions against and interactions with O'Connell. Many prejudicial statements can be found in the court papers. Some parts of the law were enforced and some were not. This attitude led to numerous violations of O'Connell's constitutional rights.

43. The result of the possession action in this case is clearly documented. Cats were forced to live in a shelter situation for at least a year, some cats for two years. Some cats died while their owner awaited due process. The entire process, and therefore the policies and procedures that guide it, violates the welfare of these animals. That is again, a unconstitutional deprivation of an owner's right to protect his or her property.

44. The State's actions created photos, videos, and documents that included the inside and outside of O'Connell's residence and many assets including vehicles and farm machinery. A big farm tractor, an old car, a grain bin, a barn full of stuff, an old milk parlor, and photos of the yard and outside of the house raise questions as to their purpose as evidence. Once created, whether used in court or not, many items made their way to the public through the Jordan Farm shelter owner and associates and may be available through the

Freedom of Information Act (FOIA). Select items paint inaccurate pictures, tell inaccurate narratives, and exposed O'Connell and her father to theft, fraud, and harassment. The AWP failed to act appropriately in collecting evidence.

45. Veterinary practices have notes in their files about requests for records due to an animal cruelty case, thereby creating a bias against O'Connell. Some local veterinarians do not want to get involved due to Animal Welfare's involvement, thereby limiting O'Connell's ability to get veterinary care for her cats. Rogers directly interferred with O'Connell's attempt to get veterinary care for her cats. For prejudice to impede a citizen's ability to get care for an animal is unacceptable. In this case, the State is using its authority to abuse these animals and impede O'Connell and has therefore failed to act appropriately.

**Statement of Claim: Fifth Cause of Action (42 U.S.C. § 1983, Maine State Statutes, Title 17-A M.R.S. §353, §354, §355)**

46. O'Connell incorporates by reference all preceding paragraphs as if fully restated here.

47. Defendants at all times relevant to this complaint were acting under color of state law and these actions deprived O'Connell of rights, privileges, or immunities guaranteed under the United State Constitution and the Maine State Constitution.

48. Defendants at all times relevant to this action were acting pursuant to a policy or custom of the AWP.

49. The AWP's policy or custom, and its failure to adopt clear policies and properly train its employees were a direct and proximate cause of the constitutional deprivation suffered by O'Connell.

50. Five of O'Connell's cat carriers and two cases of canned cat food were missing after the AWP's seizure in January. The AWP were the only people who could have taken these items. Three of the cat carriers were large and approved for airline travel; they were made from rigid plastic and securely fastened. These types of carriers are expensive. This is clearly theft.

51. The loss of cats never accounted for, particularly one that is known to have been given to a person who cannot be located, is theft.

52. Invoicing O'Connell for inappropriate expenses was fraud and attempted theft.

53. Causing O'Connell to pay over $6,000 in order to file an appeal and making calculations on inaccurate financial figures to justify that demand is highly inappropriate and knowing this action would cause her harm, is extortion and an unconstitutional form of punishment.

**Statement of Claim: Sixth Cause of Action (42 U.S.C. § 1983: Due Process, Abridge of Privileges, Violation of Maine State Constitution, Article 1, Section 1; Maine Statute Title 17 M.R.S. §1031**

54. O'Connell incorporates by reference all preceding paragraphs as if fully restated here.

55. Defendants at all times relevant to this complaint were acting under color of state law and these actions deprived O'Connell of rights, privileges, or

immunities guaranteed under the United State Constitution and the Maine State Constitution.

56. Defendants at all times relevant to this action were acting pursuant to a policy or custom of the AWP.

57. The AWP's policy or custom, and its failure to adopt clear policies and properly train its employees were a direct and proximate cause of the constitutional deprivation suffered by O'Connell.

58. Extensive evidence exists to show the AWP's cruelty toward these animals. If the AWP were not under the excuse of a law that allows them to abuse animals, they would clearly be in violation of the law. It is one thing to make allowances for true need, quite another to make up excuses to abuse. In O'Connell's case, there was absolutely no need for the AWP to proceed as it did. No animals were in danger, no animals were in need of urgent medical care, no animals were being abused. The only abuse or neglect these animals ever experienced was at the hands of the State. Laws that allow authorities to abuse it are not laws at all and are unconstitutional on their face.

59. Maine Statute Title 17 M.R.S. §1021 (5-B) imposes temporary possession bans on any owner of an animal seized under Section 1021, prohibiting possession of any animal after seizure and before a hearing. Violation of the ban is a civil violation with a maximum $200 fine each day.

    i. The Statute, on its face and as applied or threatened to be applied, is an unconstitutional restriction of a right without due process.

    ii. The Statute, on its face and as applied or threatened to be applied, is an unconstitutional opinion-based and viewpoint-based restriction of the right to own property.

    iii. The Statute, on its face and as applied or threatened to be applied, does not serve a significant governmental interest beyond collecting fees.

    iv. The Statute is unconstitutional abridgement on its face, and as applied or threatened to be applied, of O'Connell's rights to possess property and of due process.

    v. If O'Connell had been subject to this violation, she would have incurred a fine of $65,000. The only way to avoid the fine would have been to kill the 44 cats who escaped the State's capture activity.

## V.    In Conclusion

60. All defendants contributed to the constitutional rights denied O'Connell. All defendants contributed to the abuse of these animals. This can be shown through documented evidence.

61. According to records, Bagley housed some of O'Connell's cats. The medical record of Taffy, State ID #7, names Lilly Bagley as the foster mom of this cat. An invoice indicates 32 cats were held at a location other than Jordan's. Court testimony of Jordan indicates cats were held at more than one facility. Some cats were returned in carriers with the name "Bagley" written on them. Bagley conspired to withhold O'Connell's property, secret O'Connell's property, substitute O'Connell's property, and mislead O'Connell. Therefore, Bagley

acted maliciously and wantonly in conspiring to violate O'Connell's federal rights and state laws. As a known caretaker, Bagley has responsibility to obey the Judge's Order and opportunity to return cats under her care to O'Connell. By pretending to be a member of the public interested in adopting or sponsoring O'Connell's cats, Bagley conspired to create evidence O'Connell was running an unlicensed shelter. By posting misinformation and inaccurate information to the public, Bagley acted with intent to cause O'Connell harm.

62. According to records, Wendell Strout participated in most actions of the AWP, therefore he is a known conspirator. Mr. Strout made many inappropriate comments heard by O'Connell that represent him as a hostile. Mr Strout served O'Connell with a summons to court where the court date was unreadable and when O'Connell called him to get that information, he refused to provide it. When O'Connell called him for information on AWP actions, he said to her, "You think the State can't get into your house if they want to?"

VI.   **WHEREFORE, O'Connell prays that this Court:**

1. Enter a judgment against the defendants;

2. Enter a declaratory judgment declaring the acts of the defendants to be a violation of O'Connell's constitutional rights to be secure in her person, house, papers, and effects, against unreasonable searches and seizures;

3.  Enter a declaratory judgment declaring the acts of the defendants to be a violation of O'Connell's constitutional rights to due process;

4. Issue a declaratory judgment declaring the Animal Welfare Program possession laws, enforcement policies, and procedures to be unconstitutional on their face;

5. Issue a declaratory judgment declaring the possession of animals is unconstitutional as enforced and as applied;

6. Issue a temporary restraining order, and a preliminary and permanent injunction enjoining the defendants, their agents, servants, employees, officers, and the Animal Welfare Program from further harassing O'Connell or possessing her animals;

7. Issue an order to return to O'Connell any and all animals that were taken from her and may still be found;

8. Award O'Connell costs, interest and reasonable attorneys' fees for this action pursuant to 42 U.S.C. § 1988 and other relevant statutes; and,

9. Order such other and further relief as the Court deems just and proper under the circumstances.

VII. **RELIEF**

1. O'Connell incurred approximately $7,340 in legal bills and estimates her lawyer is due over $15,000 for unpaid and unbilled assistance.

2. Estimated $500 for property damage during the search and seizure to a king-sized bed and mattresses, two windows with broken glass and a broken personal keepsake sculpture.

3. O'Connell incurred over $2,000 in veterinary bills to get 16 cats vaccinated against rabies and three of those cats were never returned. O'Connell spent over $400 in veterinary bills on Toxic, a cat killed by the State with a potential 10 more years to live.

4. O'Connell spends money, time, and energy on these cats to enjoy their companionship and emotional support for their lifetimes. Part of that emotional support is seeing them safe and knowing they are living their longest and best possible lives. The defendants have stolen these things from her. The average cost for O'Connell to keep a cat for a year is $500 according to her records. This is half of the national average. This is what O'Connell is willing to spend for the benefit of companionship and emotional support; therefore, the average yearly value of a cat is $500. The average life span of a cat is 12 years; therefore, the average total value of a cat is $6,000.

   a. $7,500 for the loss of Taffy

   b. $18,000 for the loss of future companionship and comfort of 3 cats who were unnecessarily killed or died in the custody of the State: 3 x $500 x 12 = $18,000

   c. $32,000 for the loss of companionship and comfort of 64 cats gone for a year: 64 x $500 = $32,000

   d. $24,000 for the cost of care over lifetime of four cats who were given to O'Connell by the State: 4 x $500 x 12 = $24,000

e. $18,000 for the loss of companionship and comfort of 18 cats in the custody of the state for at least one year and eight months: 18 x 20 x $500 = $18,000

f. Potential $600,000 for the over 100 cats mistakenly granted to the AWP if they are determined dead or unretrievable.

g. The Giardia infection is estimated to cost $100 extra per cat per year. This includes cleaning up diarrhea daily, cleaning up fecal matter from cat fur, extra cleaning of litter boxes and environment with harsh chemicals to kill oocysts, and supportive medical care. The number of cats is 50 at this time. 50 x 12 = 600 x 100 = $60,000

h. $9,000 for therapy for grief, stress, and emotional distress at $150 per month for 5 years: 12 x 5 x 150 = $9,000

5. One million in punitive damages for:
   1. Ongoing pain and suffering of grief caused by the loss of pets, the circumstances of their deaths and last months, the inappropriate lack of notification, and cruel inability to properly bury the pet in its home ground.
   2. Violating O'Connell's property rights.
   3. Violating state and federal laws with forethought, knowledge, and intention.
   4. Violating rights granted by the constitution of the United States to a citizen of the United States.
   5. Inappropriately describing, submitting, documenting, and fabricating evidence.

6. O'Connell experienced fear, humiliation, mental anguish, grief, anger, sadness, and depression due to these events and will continue to experience emotional distress for the rest of her life due to the unwarranted loss of over 100 precious animals. Even after winning her case, Rogers filed another show cause order against her and had her back in court on the same issues. On that day, O'Connell seriously considered suicide, something she had never considered before in her life. The legal process is supposed to protect us from all others. It protected O'Connell after the first seizure when she could afford a lawyer and happened to get a thoughtful and attentive judge, but it could not force the AWP to act appropriately. They continued to harass her until they got a favorable judge and eliminated all her cats. The legal process does not protect the indigent and free legal assistance is not always available or willing.

Date: 11/5/2024

Signature: *Kathleen O'Connell*

222 Ridge Rd

Wales, Maine 04280

207-754-6322

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2024, the original of the foregoing complaint was filed in person with the court at:

United States District Court
156 Federal Street
Portland, ME 04101

A copy of the complaint was mailed to all the foregoing named defendants at their last known address:

Liam Hughes
Rachael Fiske
Angela Rogers
Wendell Strout
Heidi Jordan
Lillian Bagley

Kathleen O'Connell, Plaintiff | Date